[Civ. No. 5668.   Fourth Dist.   May 26, 1958.]

EMBREE URANIUM COMPANY (a Limited Partnership), Plaintiff and Respondent, v. FRANK LIEBEL et al., Appellants; JOHN C. REAVES, Intervener and Respondent.

Mack, Bianco, King & Eyherabide for Appellants.

Di Giorgio & Davis for Plaintiff and Respondent.

Philip M. Wagy for Intervener and Respondent.

*Assigned by Chairman of Judicial Council.

MUSSELL, J.—This is an action to recover the purchase price paid by plaintiff partnership for mining property in Kern County. Plaintiff alleged a common count for money had and received in the sum of $40,000 and the case was tried on that cause of action. Defendants appeal from the judgment rendered in favor of plaintiff and contend that plaintiff failed to comply with the applicable rules of law relating to rescission so as to furnish the foundation for the common count of moneys had and received.

In the summer of 1950 the defendants asked for and obtained permission from Mr. and Mrs. Flood to prospect on real property owned by the Floods in Kern County. Defendants then commenced prospecting, drilling, blasting and mining on the property, and on July 2, 1951, filed a notice of location of the "Unip Mine," most of which was located on the Flood property. Defendants shipped ore from the premises with the knowledge and consent of the Floods and without any claim being made by them for royalties or to any of the proceeds received by the defendants for such ore.

In July, 1954, L. G. Embree, one of the members of plaintiff partnership, became interested in the mine and commenced negotiations for its purchase. These negotiations resulted in an assignment by defendants to plaintiff of the Unip mine and four other adjacent claims, on November 29, 1954, for a total consideration of $40,000. Upon defendants' instruction and pursuant to prior negotiations all of the $40,000 consideration was paid for the Unip mine and no, or nominal, consideration was paid for the other claims, Unip Numbers 2, 3, 4 and 5, which were not on the Flood property and were located on or about August 10, 1954. There was testimony to the effect that these other claims were "thrown in for good measure" and that no development work was performed on them.

Two separate assignments were executed by defendants on November 29, 1954, one describing the Unip mine and the other Unip mining claims Numbers 2, 3, 4 and 5. Each assignment contains, in part, the following language:

"Assignors hereby covenant with Assignee that said mining claim is free from all encumbrances, and do hereby agree to warrant and defend the same to said Assignee against the claims and demands of all persons whomsoever."

Immediately after having purchased and paid for the Unip mine, members of plaintiff partnership went to see Mrs. Flood and obtained from her a written agreement, dated

December 17, 1954, in which, after reciting that she owned the surface rights, she agreed to execute a lease to plaintiff on approximately 10 acres for a period of five years, at a total rental of $500, the land to be used for a millsite and mining operations. This agreement further provides as follows:

"The lease will provide for additional five year extensions as long as the lessees require the property at same rental. In addition the lessees are to be given an option to purchase the said land at an agreed price in the event I sell the remaining land adjacent to the land covered by the lease."

After securing this agreement, plaintiff partnership commenced mining operations on the Unip claims and continued their operations until about August 10, 1955, when they "ran out of money" and "production was not paying." During this period plaintiff spent approximately $100,000 in mining and developing the claim, installing equipment thereon consisting in part of a hoist, a mill, balance mill, screens, crusher, concentrating tables, power plant and compressor. Plaintiff shipped and sold approximately $29,000 worth of ore from the Unip mine without any objection from the Floods and no demand for payment of royalties was made by them.

In late August or early September, 1955, the attorney for Mrs. Flood orally informed plaintiff's attorney that plaintiff was trespassing on her land and on September 7, 1955, she gave plaintiff a written one-month's notice to quit in which she stated that defendants were occupying the property without authority of the owner; that they entered the property under a so-called option dated December 17, 1954; that said option was without consideration and was terminated May 5, 1955, and that defendants have since occupied the premises under a tenancy at will.

On or about October 10, 1955, plaintiff entered into negotiations for a sale of the mine and an agreement of sale and purchase was obtained. However, plaintiff was informed by a title company that it did not own the mine and the sale was never accomplished. In this connection a land title examiner testified that he examined the title to the Unip claim and found it to be vested in Mary Flood, and that the title to the other claims was vested in the United States of America.

Upon ascertaining that it did not own the Unip claim and mine, plaintiff entered into negotiations with the owner,

Mary Flood, to settle her claim of paramount title and possession of the property. These negotiations resulted in a settlement in which plaintiff quitclaimed all of its interest in the mining claim to Mrs. Flood and she executed a lease of the property to plaintiff.

Plaintiff filed the instant action on March 7, 1956, without giving notice of rescission or offering to restore the consideration.

The trial court found, among other things, that when the defendants agreed to sell the Unip mine to plaintiff the mine was located on the fee land of Mary Flood; that defendants did not own the mine; that it was agreed that the full consideration of $40,000 would pass as the price of said mine; that defendants on November 2, 1954, represented and warranted in writing that they were the owners of said Unip mine and that the same was free and clear of the claims of any other persons whomsoever; that in reliance on the representations and warranty of defendants, plaintiff paid to defendants the sum of $40,000; and that the Unip mining claims Numbers 2, 3, 4 and 5 were of no value. These findings are supported by substantial evidence and are sufficient to support the judgment.

Appellants concede that the plaintiff had the right to rescind the contract to purchase but contend that plaintiff cannot recover because no notice of rescission was given and no offer to restore everything of value received was made. We are not in accord with this contention.

In 12 California Jurisprudence 2d, section 195, pages 412-413, it is said that

"Compliance with the requirement to rescind promptly implies some notice to the other party of the determination to extinguish the contract. No specific form of notice is required, and it is not necessary that the notice be formal and explicit. It is sufficient if it gives the other party a clear indication of the intention to consider the contract at an end.

"Where there is a total failure of consideration, notice of rescission is not essential to the maintenance of an action to recover payments made under the contract. In such a case the initiation of the action itself would seem to be sufficient notice."

In *San Diego Construction Co.* v. *Mannix*, 175 Cal. 548, 558 [166 P. 325], the court said:

"That no formal demand for a rescission, other than the

bringing of the action for the purchase money paid, is necessary, where the vendor has refused to convey on demand, after full payment of the price, and that no offer to restore was required where there was nothing to restore, as is the case here, are well-settled propositions. (*Chatfield* v. *Williams*, 85 Cal. 521 [24 P. 839]; *Thomas* v. *Pacific etc. Co.*, 115 Cal. [136,] 142 [46 P. 899]; *Carter* v. *Fox*, 11 Cal.App. 71 [103 P. 910].)''

In 12 California Jurisprudence 2d, section 197, page 415, it is said:

''While it is the general rule that restoration of the parties to statu quo is a prerequisite to the rescission of a contract, the rule has no application and there is nothing to restore if the rescinding party has received nothing, or has received nothing of value. Nor is a person seeking to rescind a contract obliged to return things not received under the contract and which he is entitled to retain in any event.

''A positive refusal by a party to return the property which he has received relieves the other party from the necessity of offering to return the consideration received by him. And the duty of a rescinding party to restore the other to statu quo does not extend to undoing acts performed by the other party.''

In the instant case defendants sold a mining claim which they did not own and plaintiff received nothing from them for the $40,000 paid.

Appellants argue that the possessory rights secured by plaintiff were valuable and that plaintiff was required to restore these rights to them in order to maintain the present action. However, the record shows that before plaintiff entered upon the premises and commenced mining operations thereon it secured a written agreement to lease from the owner, Mrs. Flood. While oral permission to prospect the property was given appellants by her, that permission was terminated when she agreed to lease the property to plaintiff. The surface rights as well as the Unip mine were at all times the property of the Floods. The plaintiff received its possessory rights from the Floods and not from the defendants. It follows that no offer of restoration was required as a prerequisite to the filing of the instant action.

Judgment affirmed.

Barnard, P. J., and Griffin, J., concurred.